**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MICHAEL SHEARMAN,                                    Case No. 1:12-cv-760

       Plaintiff,                                         Spiegel, J.
                                                     Bowman, M.J.
   v.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff Michael Sherman filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled.   *See* 42 U.S.C. §405(g).   Plaintiff presents three claims of error, all of which the Defendant disputes.   Because it is supported by substantial evidence in the administrative record, the undersigned recommends that the Commissioner's decision be AFFIRMED.

    **I.**     **Summary of Administrative Record**

In July 2008, Plaintiff applied for both disability insurance benefits ("DIB") and for supplemental security income ("SSI"), alleging a disability onset date of December 2, 1994.   Plaintiff's applications were denied initially and on reconsideration, after which Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ").   On July 27, 2010, ALJ Christopher McNeil conducted an evidentiary hearing at which he heard testimony from Plaintiff, who was represented by counsel, and from two impartial medical experts, and a vocational expert. (Tr. 31-85).   By the time of the hearing, Plaintiff had conceded that the date last insured (June 1999) was "too remote to allow

1

for a viable SSD claim," given that the medical "records really only start around 2000." (Tr. 35-36, 288 at n.1).  Therefore, Plaintiff has waived any DIB claim.  *Id.*  On October 13, 2010, the ALJ issued a written decision in which he found no medical evidence "showing severe impairments between the alleged onset date of December 2, 1994 and the date last insured of June 30, 1999" resulting in a denial of the DIB claim.  (Tr. 15). Even considering later evidence of severe impairments for Plaintiff's SSI claim, the ALJ determined that Plaintiff was not disabled during the relevant time period.  (Tr. 12-23). The Appeals Council denied Plaintiff's request for further review, leaving the ALJ's decision as the Defendant's final decision.

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 2, 1994. (Tr. 14).  Plaintiff has the following severe impairments:  "poly-substance abuse disorder, diabetes, and arthritis," as well as non-severe impairments of hepatitis C, mild hearing loss, and dysphagia. (Tr. 14-15).  However, none of those impairments or combination thereof met or medically equaled any listed impairment in 20 C.F.R. Part 404, Subpart P, Appx. 1.  (Tr. 15).  Plaintiff was 43 years old on his alleged disability onset date, but had entered the "advanced age" category by the date of the ALJ's decision, with a limited eleventh grade education.  (Tr. 22).

Considering the record as a whole, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a limited range of medium work:

> The claimant can lift 50 pounds occasionally and lift 25 pounds frequently; push or pull 25 pounds with hand or foot controls; and sit, stand, or walk about 6 hours in an 8-hour workday.  He should engage in no more than frequent balancing, stooping, kneeling, crouching, or crawling; no more than frequent use of ramps or stairs; and no more than occasional use of ladders, ropes, and scaffolds.  He should also avoid all exposure to hazardous machinery, exposure to unprotected heights, and concentrated exposure to noise.  Due to mental limitations, he can perform only simple and repetitive tasks in a non-public setting without demands for fast

2

paced, high production, or frequent changes in assigned tasks.  He should only have occasional contact with co-workers, supervisors, or the public and can adapt to only occasional changes, and only when changes are clearly explained and are routine in nature.

(Tr. 17).  Based upon Plaintiff's RFC and testimony from the vocational expert ("VE"), the ALJ found that Plaintiff cannot perform past work as a food service worker, but that, during the relevant period, he would be able to perform other jobs that existed in significant numbers in the national economy, including the jobs of cleaner, warehouse worker, and packer.  (Tr. 23).  Therefore, the ALJ held that Plaintiff was not disabled.

Plaintiff's appeal alleges that the Commissioner erred by: (1) determining an RFC that is internally inconsistent with, and fails to fully reflect, all of Plaintiff's severe impairments; (2) improperly weighing the opinion evidence; and (3) improperly assessing Plaintiff's credibility.  The Commissioner has filed a response in opposition.[1]

.  **II. Analysis**

**A.  Judicial Standard of Review**

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act.  *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported

---

[1]Plaintiff sought and was granted an extension of time, but elected not to file a reply memorandum.

by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . ... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for either DIB or SSI, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national

economy.  *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

### B.  Plaintiff's Claims of Error

### 1.  The ALJ's RFC Finding

Plaintiff complains that the ALJ erred in his assessment of Plaintiff's residual functional capacity in three distinct ways: (a) because the RFC is internally inconsistent; (b) because the RFC fails to account for Plaintiff's diabetes, neuropathy, venous insufficiency, and degenerative arthritis; and (c) because the RFC does not reflect the full extent of Plaintiff's impairments from arthritis and hearing loss.  A vocational expert's testimony in response to a hypothetical question that portrays a claimant's impairments ordinarily provides substantial evidence to support the Commissioner's decision, but only if the RFC portrayed to the VE is accurate.  *See Davis v. Sec'y of Health and Human Servs.*, 915 F.2d 186, 189 (6th Cir. 1987).  Thus, an error in the formulation of a claimant's RFC will require reversal, unless the error is *de minimis* or harmless.

### a.  Internal Inconsistency Regarding Public Interaction

There is no doubt that the RFC in the ALJ's written opinion contains an inconsistency. In formulating the hypothetical to the VE at the hearing, the ALJ stated that Plaintiff should be limited to work in a "non-public setting." (Tr. 79).  However, the written RFC contradictorily states that Plaintiff should have only "occasional contact with co-workers, supervisors, *or the public.*" (Tr. 17, italics added).  In response, Defendant asserts that this is nothing more than a typographical error which is of no consequence, considering that the ALJ clearly directed the VE to consider only jobs in a "non-public setting."  In fact, at first the ALJ verbally related the same wording of the RFC limitation in his written decision, of jobs that did not require more than "occasional contact with co-

workers, supervisors, or the public." Almost immediately, however, the ALJ caught the error and corrected his verbal hypothetical to "strike that with respect to the public," because he had "already addressed the public."  (Tr. 79-80).  And in fact, none of the jobs identified by the VE require contact with the public.  (*Id.*).

Even Plaintiff concedes that "[t]his logical inconsistency can be easily addressed by choosing only those jobs which do not require any public contact, and thus, …might be only harmless error."  (Doc. 10 at 11).  Plaintiff argues that the error rises to grounds for reversal only when considered in combination with other asserted errors.  (*Id.*).  Finding no other grounds for reversal, the undersigned finds this minor typographical inconsistency to be harmless error.

### b.  Failure to Account for Each Impairment

Plaintiff next argues that the ALJ failed to list limitations that correlate with each and every "severe" impairment.  However, "[a] claimant's severe impairment may or may not affect his or her functional capacity to do work.  One does not necessarily establish the other."  *Walker v. Astrue*, 2012 WL 3187862 at *5 (S.D. Ohio 2012), quoting *Griffeth v. Com'r of Soc. Sec.*, 217 Fed. Appx. 435, 429 (6th Cir. Feb. 7, 2007)(internal quotation marks and additional citation omitted).  In other words, there is no legal requirement for a specific limitation to be included in a hypothetical RFC in order to represent every "severe" impairment.  *Griffeth*, 218 Fed. Appx. at 429 (disagreeing that the Sixth Circuit has established any such proposition).

Plaintiff complains that the RFC failed to account for Plaintiff's diabetes, and specifically, his peripheral neuropathy and/or venous insufficiency as identified by Dr. Donita Keown in connection with an evaluation conducted for the Tennessee Disability Determination Services in July of 2006. (Tr. 312-313).  During her physical examination,

6

Dr. Keown noted Plaintiff was "ambulatory at a quick pace," without use of any assistive device, with full range of motion of his shoulders, elbows, wrists and hands.  (Tr. 311-312).   She noted a "hyperpigmented" appearance to his lower legs, described as "minor" on the right but more pronounced on the left.  She found both legs to be "thinner than one would expect," but that strength testing was normal, and Plaintiff was able to toe/heel walk and had a normal one foot stand and Romberg test, with only "minor instabilities" noted during a tandem walk.  (Tr. 312).    Presumably based upon the appearance of Plaintiff's legs, she diagnosed venous insufficiency and/or diabetic neuropathy, and opined that Plaintiff would be limited to four hours of standing and/or walking, and to five or six hours of sitting in an eight-hour workday.  (Tr. 313).

In further support of standing/walking limitations, Plaintiff refers to a few records documenting his use of a cane.  (*See, e.g.*, Tr. 522, 744).  However, the ALJ specifically pointed out that the cane has not been prescribed by any physician.[2]

 Dr. Hulon, the medical expert on whose opinion the ALJ heavily relied, clearly testified both in response to interrogatories and during the hearing that Plaintiff does not have diabetic neuropathy. (Tr. 43).   Dr. Hulon explained that the only support for that diagnosis was in Dr. Keown's notes from her single 2006 disability examination.  Although Plaintiff then alleged "pain, numbness and tingling in the lower extremities, both feet and distal lower legs when ask[ed] about diabetic symptoms," Dr. Hulon pointed out that Plaintiff claimed to suffer from the same symptoms since a 1993 accident in which he suffered leg fractures, suggesting that was more likely the cause of the appearance of Plaintiff's leg and/or symptoms than diabetic neuropathy.  (Tr. 715).

---

[2]As discussed below, Plaintiff also alleged use of a brace/splint and glasses, which also were not prescribed and which the ALJ also did not take into account based upon credibility.  Plaintiff makes no argument in this appeal concerning his alleged use of the brace/splint or glasses.

In fact, Plaintiff was not diagnosed with diabetes until just a few months prior to Dr. Keown's exam.  Dr. Hulon also pointed out that the diagnosis of neuropathy was undermined by Dr. Keown's physical exam, which found normal muscle strength and which did not include any sensory exam such as a diabetic neuropathy test of the lower extremities.  Significantly, all of Plaintiff's other examinations reflected normal strength and normal neurological exams. (Tr. 715). Although Dr. Hulon did not have Plaintiff's complete records at the time he provided his interrogatory response, he testified that he reviewed additional records prior to the hearing, and that those records did not alter his prior interrogatory responses.  (Tr. 42).  The undersigned concludes that Dr. Hulon's testimony and Dr. Keown's physical examination notes provide substantial evidence to support the ALJ's refusal to include additional limitations in the RFC specifically relating to Plaintiff's alleged diabetic neuropathy and/or venous insufficiency.

Next, Plaintiff asserts that the RFC failed to account for Plaintiff's degenerative arthritis and/or osteoarthritis, as documented by both x-rays and MRI.  Plaintiff argues that he frequently complained of pain, which Plaintiff asserts should have led to the conclusion that Plaintiff is capable of no more than light exertion, rather than the heavier medium level exertion.

Although the ALJ did not specifically discuss the MRI evidence, an ALJ is not required to discuss every medical record.  Importantly, Dr. Hulon testified that he had reviewed the imaging records but that Plaintiff could still perform medium work.  (Tr. 42). Dr. Hulon concluded that, at least through the 2008 records he reviewed prior to responding to the interrogatories, there was

> no evidence that the clt. complained of lower extremity arthritic symptoms, (other than 1F [to Dr. Keown]), and no evidence of positive arthritic findings in ANY of the physician examinations or nurse assessments.  All

> examinations note normal neurological and musculoskeletal findings.
> AND 06/01/08 – clt. still riding motorcycle.

(Tr. 717, emphasis original).[3]  Dr. Hulon opined that Plaintiff had only "mild" age-related arthritis.  When Plaintiff reported to an Emergency Room in September 2008 after being in a car accident, his exam was "normal except for mild tenderness and some decrease in cervical range of motion, back and shoulder were negative or normal," and his x-ray showed only mild degenerative changes in his cervical spine.  (Tr. 584, 717).

Plaintiff relies heavily on an October 2008 imaging study in which his arthritis was characterized as "mild to moderate," arguing that the ALJ's reference to his arthritis as "mild" must be erroneous because arthritis is a degenerative condition which "had no doubt progressed even further by the time of the hearing."  (Doc. 10 at 15).  Plaintiff is incredulous that the ALJ could have found him to be capable of lifting 25 pounds frequently and 50 pounds occasionally in light of his arthritis.  In the referenced MRI study, the age-related arthritis was described in several discrete areas of the spine as "mild to moderate." (Tr. 763-764).

At the hearing, however, Dr. Hulon specifically discussed the "mild to moderate" findings in the MRI study.  He explained that even though the MRI showed foraminal narrowing, it is not narrowing, per se, that causes pain and/or limitation.  (Tr. 41-42).  Dr. Hulon further testified that there was no evidence in the MRI that Plaintiff actually suffers from cord compression that would cause significant limitations because there was no increased intensity of the signal of the cord.  (Tr. 52).  For that reason, he affirmed Plaintiff's arthritis as not more than "mild to moderate." (Tr. 54).  Although Dr. Hulon testified that someone with that condition "could" have "some" limitations sitting,

---

[3]Plaintiff was a member of the motorcycle gang, the Iron Horsemen, for at least 40 years. (Tr. 677).

standing, walking or lifting (Tr. 54-55), he declined to alter his prior conclusion that Plaintiff retained the ability to perform a reduced range of medium work.  (Tr. 42, 83).

Again, the ALJ's decision not to include additional arthritis-related limitations is supported by substantial evidence, including Dr. Hulon's opinions and the clinical records to which Dr. Hulon refers.  The ALJ also discussed x-ray evidence concerning the post-traumatic arthritis in Plaintiff's hips and knees, which also showed only mild changes.  (Tr. 15, citing Tr. 318, 320). Plaintiff heavily relies upon Dr. Keown's July 2006 opinion (Tr. 313) that Plaintiff should be limited to a reduced range of light work, but that opinion was rejected for good reason – as discussed both above and in the next section of this Report and Recommendation.  Plaintiff's speculative argument, that his condition "must" have worsened between the MRI and the date of the hearing, provides no grounds for reversal.

### c.  Whether the RFC Fully Accounts for Severity of Impairments

In a nearly identical third argument, Plaintiff contends that the RFC failed to fully account for the extent of Plaintiff's limitations.  Aside from arthritis, Plaintiff suggests in a footnote (Doc. 10 at 15, n.3) that the ALJ improperly failed to account for the degree of his digestive problems, described as "dysphagia" by the ALJ (Tr. 15), for which Plaintiff alleges he was hospitalized in July 2008.  (Tr. 518).  The record to which Plaintiff refers was his hospitalization for diabetic ketoacidosis and related symptoms, including vomiting caused by that condition. During his hospitalization, Plaintiff underwent a diagnostic EGD during which Plaintiff was diagnosed with an ulcer and gastroparesis. Physicians directly attributed Plaintiff's symptoms to his polysubstance abuse and continued refusal to comply with a diabetic diet.  (Tr. 518-519: "The patient is not willing

to change any of these habits…he has a diabetic gastroparesis also, and this is not helping to control his swallowing problems.").

Plaintiff does not explain what limitations should have been included in the RFC to account for his alleged digestive issues.  In fact, Plaintiff concedes that ""[i]t is true that Plaintiff's digestive impairments are less likely to limit his ability to work (except for his ability to maintain acceptable standards of attendance and punctuality)."  (Doc. 10 at 15, n.3).  However, Plaintiff fails to point to any evidence that his digestive problems would actually interfere with acceptable attendance standards; certainly the temporary symptoms brought on by limited episodes of diabetic ketoacidosis would not support such a conclusion.  Accordingly, the undersigned finds no error concerning the ALJ's failure to include additional limitations relating to Plaintiff's digestive issues.

The only other impairment as to which Plaintiff challenges the RFC is Plaintiff's hearing loss. (Tr. 297-313, 653-658).  Plaintiff claims that the ALJ's limitation of "no concentrated exposure to noise" and to work in a non-public setting with only occasional contact with co-workers and supervisors "does not fully encompass all situations in which Plaintiff would have difficulty hearing."  (Doc. 10 at 19).  Plaintiff suggests that his hearing loss also would limit him to at least light, if not sedentary exertion.  However, Plaintiff never explains in what manner the RFC is insufficient.   For example, Plaintiff does not make any claim that the jobs identified by the VE would have required some greater hearing level than he possesses.  By contrast, the medical expert testified that there were inconsistencies in the ontological test (Tr. 56), and opined that although Plaintiff might have difficulties hearing in noisy environments, he would do "pretty well" in quiet environments. (Tr. 59).  It is also worth noting that hearing loss generally has no

bearing on ability to lift (exertional level). In short, the undersigned finds substantial evidence exists to support the ALJ's RFC finding concerning Plaintiff's hearing loss.

### 2. Weight Given to Opinion Evidence

As a second assertion of error, Plaintiff contends that the ALJ improperly weighed the medical opinion evidence.

### a. Mental RFC Opinions: Drs. Jette and Schwartz

In formulating Plaintiff's mental RFC, the ALJ relied on several consulting psychologists, including a testifying medical expert (Dr. Schwartz), while rejecting the opinion of a treating psychiatrist, Dr. Jette. It is well-settled that the opinions of a treating physician like Dr. Jette must be given "controlling" weight if those opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in your case record." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). If an opinion of a treating physician is not given controlling weight, the ALJ must provide "good reasons" for rejecting that opinion in whole or in part. *Id.*

Plaintiff argues that the ALJ erred by failing to give "at least substantial, if not controlling" weight to Dr. Jette. (Doc. 10 at 23, emphasis original). After treating Plaintiff for a seven month period from December 2009 until June 2010, Dr. Jette completed a mental residual functional capacity assessment on July 1, 2010 (Tr. 724-730), in which he diagnosed Plaintiff with a mood disorder and assigned a GAF score of 50. Dr. Jette checked boxes indicating the Plaintiff is "unable to meet competitive standards" in six of the mental functions listed, and rated Plaintiff as "seriously limited but not precluded" in three areas of even unskilled work. (Tr. 726). He further opined that Plaintiff had marked to moderate limitations in four broad functional areas, (Tr.

12

728), and that Plaintiff would miss at least four days of work per month.  (Tr. 729).

Nevertheless, Dr. Jette also indicated that Plaintiff could "remember work-like

procedures; understand, remember, and carry out very short and simple instructions;

make simple work-related decisions; ask simple questions or request assistance; and

be aware of normal hazards and take appropriate precautions."  (Tr. 20).

Dr. Jette made "check" marks next to a query about whether Plaintiff has a

"[m]edically documented history of a chronic organic mental…or affective disorder of at

least 2 years' duration," suggesting that Plaintiff had experienced four or more episodes

of decompensation lasting two or more weeks, and that Plaintiff has a "residual disease

process that has resulted in such marginal adjustment that even a minimal increase in

mental demands…would be predicted to cause the individual to decompensate," (Tr.

728-729).  While providing some narrative answers to other queries, Dr. Jette did not

explain the basis for those check marks.  Dr. Jette also did not respond to a separate

query asking him to identify the "approximate dates of each episode of

decompensation."  (Tr. 728). In fact, the undersigned finds no other evidence anywhere

in the record that Plaintiff has experienced significant episodes of decompensation

lasting two or more weeks in duration.

Ultimately, the ALJ rejected the most extreme opinions of Dr. Jette as entitled to

"little weight."  The ALJ explained:

> While Dr. Jette has a long standing treatment history with the claimant, he
> has considered his impairments to be more severe than other medical
> experts, and his opinion is not supported by the objective evidence or by
> his own treatment notes.  In addition, Dr. Jette is not a source who has
> been shown to be familiar with the Social Security disability program, and
> his findings are contradicted by the credible portions of the claimant's
> activities of daily living.

(Tr. 21).   Thus, the ALJ found Dr. Jette's opinions not to be entitled to "controlling weight" because they were not well supported, and were inconsistent with the other substantial evidence in the record concerning Plaintiff's mental RFC.

Plaintiff argues that the ALJ's stated reasons are not sufficiently "good reasons." Plaintiff argues that the first reason – that Dr. Jette's opinion is not supported by his treatment notes - is inaccurate because Dr. Jette's notes are entirely consistent with his opinions, as are the treatment notes of Plaintiff's therapist.   Having reviewed those notes, the undersigned cannot agree.   While some consistencies can be found, many discrepancies (such as the lack of reference to any episodes of decompensation of extended duration) are also apparent.   (*See also*, Tr. 682, 10/6/09 reference to not riding his motorcycle "much any more" due to pain, but visits 7-year-old daughter as often as he can; Tr. 699, 5/13/10 warned about narcotic abuse violations of medical contract).

In addition, the ALJ correctly pointed out that Dr. Jette's opinions were "more severe than other medical experts," and "not supported by the objective evidence." In fact, no fewer than five consulting psychologists offered less limiting mental RFC opinions.  Following a consulting examination in 2006, Dr. Kennon opined that Plaintiff had "mild to moderate" depressive symptoms relating to his physical symptoms, as well as alcohol abuse, possible dependence and "difficulties with social conformity."   (Tr. 307).   Dr. Kennon opined that Plaintiff may have "difficulty coping with stressors" and "may not adapt well to changes in his environment" but did not offer any more significant limitations. (Tr. 308). In October 2007, Dr. Sexton examined Plaintiff and also emphasized Plaintiff's alcohol abuse, concluding that Plaintiff would be able to perform simple, repetitive tasks and be able to understand, recall and carry out simple

instructions.  Dr. Sexton assessed only mild impairments in Plaintiff's ability to interact with others, tolerate daily stressors, or the pressures of the work environment.  (Tr. 302).

In contrast to the relatively mild limitations offered by Drs. Kennon and Sexton in 2006 and 2007, Dr. Johnston and Dr. Flynn opined in 2008 that Plaintiff had "moderate" limitations in three of the four "B" Criteria functional areas, but with no episodes of decompensation. (Tr. 616, 626).  The ALJ gave the opinions of Drs. Kennon and Sexton only "some weight" on the basis that their evaluations, like that of Dr. Keown's one-time 2006 evaluation, were "remote in time compared to the relative claim dates" of 1994-2010.  (Tr. 19).  However, the ALJ gave "great weight" to the 2008 opinions of Drs. Johnston and Flynn on grounds that their opinions were based on objective evidence, "consistent with the record as a whole" including "activities of daily living," and "not directly contradicted by the claimant's treating source." (Tr. 20).

Plaintiff argues that the ALJ was wrong to adopt the opinions of Drs. Johnston and Flynn because their 2008 opinions predated, and conflicted with, Dr. Jette's 2010 opinions.  However, there is no evidence of any significant mental health issues (other than substance abuse) for most years of alleged disability, beginning with Plaintiff's onset date of December 1994 through June 2008.  In clinical records dated June 2006 and in May 2008, Plaintiff expressly denied any history of mental health treatment on either an inpatient or outpatient basis.  (Tr. 304, 387).  To that extent, the ALJ was correct in assessing the opinions of those two consultants as consistent with the record and based on objective evidence, at least through the dates of their 2008 opinions.

More importantly, the mere fact that Plaintiff's treating psychiatrist offered a more severely limiting opinion in 2010 does not mean that the 2008 opinions were contrary to

the record as a whole.  The ALJ also gave "significant weight" to the opinions of the medical expert, Terry Schwartz, Psy.D., who had access to the entire record and specifically discussed the basis for offering less limiting opinions than offered by Dr. Jette.  (Tr. 21).  Dr. Schwartz opined that Plaintiff would have only mild difficulty with activities of daily living, but moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace.  He opined that "[p]olysubstance abuse and dependency are [Plaintiff's] primary problems." (Tr. 690). Consistent with the record, Dr. Schwartz found no evidence of episodes of decompensation of extended duration.  (Tr. 688-692).  Although Dr. Schwartz initially responded to interrogatories prior to reviewing later records, he testified that he had reviewed additional records, including Dr. Jette's opinions, but found no basis for altering his opinions.  (Tr. 37).

Plaintiff now claims that Dr. Schwartz's opinions are not well-supported, because he failed to cite to any specific pages or dates in Dr. Jette's notes. However, such citation was not required.  During his testimony, Dr. Schwartz clearly articulated the basis for disagreeing with Dr. Jette's more extreme mental limitations.  He explained why he believed Dr. Jette's opinion reflected that Plaintiff's long-standing substance abuse was material and strongly impacted his clinical picture, consistent with earlier records and opinions.  (Tr. 37).

Urging this Court to reject that analysis, Plaintiff asserts that Dr. Schwartz's interpretation of Dr. Jette's comments is "poorly thought out," and therefore "too weak to rely on."  (Doc. 10 at 23).  Instead, Plaintiff argues that Dr. Jette's opinions should have been adopted since Dr. Jette expressly considered Plaintiff's substance abuse.  In response to a question concerning whether substance abuse contributes to his opinions on Plaintiff's limitations, the psychiatrist wrote:  "unprescribed opiate use to relieve pain.

16

I cannot prescribe this medication due to the scope of my practice.  I am uncomfortable keeping him on chronic benzodiazepine therapy due to substance abuse hx [history]." (Tr. 729).  In response to a follow-up query about what changes he would make to his description of Plaintiff's limitations in the absence of substance abuse, Dr. Jette replied that "[r]egular prescribed pain medication would clarify his clinical picture."  (Tr. 730). Thus, Plaintiff suggests that Dr. Jette believes that Plaintiff would benefit from (and needs) prescription pain medication, and that if his pain were properly controlled, that could in turn lessen his psychological limitations.   Conversely, reasoning that his unregulated substance abuse at least partially controls his pain, Plaintiff argues that stopping his substance abuse would actually worsen his physical and psychological state.   On that ground, Plaintiff contends that Dr. Jette's report "is properly interpreted as supporting a finding that alcohol and substance use are not material to a finding of disability."  (Doc. 10 at 24).

While Plaintiff's argument is creative, the undersigned finds no reversible error in the evaluation of Dr. Jette's opinions and adoption of a less limiting mental RFC.  This Court will not reverse so long as the ALJ's interpretation and/or rejection of Dr. Jette's opinions is supported by substantial evidence. The undersigned finds the ALJ's analysis of Dr. Jette's opinion to be persuasive.  The undersigned also reads Dr. Jette's opinion as reflecting his belief that Plaintiff's substance abuse is preventing adequate treatment, but contrary to Plaintiff's position, agrees with the ALJ that this implies that Plaintiff would not be as limited in the absence of his substance abuse.  In short, there is no doubt that the ALJ's (and Dr. Schwartz's) analysis was both reasonable and supported by the record.

Plaintiff also complains about the ALJ's reference to Dr. Jette not being familiar with social security standards on grounds there is no regulatory requirement that a treating physician possess such familiarity.  However, in cases like this one when a treating physician's opinion is not given controlling weight, the ALJ must evaluate the opinion using the same factors applicable to other medical opinions, one of which is "the amount of understanding of our disability programs and their evidentiary requirements." 20 C.F.R. §416.927.  In addition, opinions on ultimate issues, including RFC and whether a claimant is disabled, are expressly "reserved to the Commissioner" and therefore are not the types of opinions entitled to controlling weight even if expressed by a treating physician.  20 C.F.R. §416.927(d).

### b.  Physical RFC Opinions - Dr. Hulon and Dr.  Keown

Last, Plaintiff criticizes the weight given to the physical RFC opinions of Dr. Hulon.  As a medical expert, Dr. Hulon reviewed the entirety of the record and listened to Plaintiff's testimony prior to offering opinions concerning the severity of Plaintiff's various conditions.  Plaintiff complains that Dr. Hulon's testimony reflects an erroneous belief that musculoskeletal pain alone cannot be disabling, because Dr. Hulon "repeatedly harped on his opinion that the evidence did not support a finding that Plaintiff's nerve roots were being damaged by his degenerative disc disease, and …stated that basic osteoarthritis cannot be disabling nor cause any limitations." Plaintiff points to Listing 1.02 (which he does not claim to meet) to support the proposition that one need not have neurological deficits in order to be found to be disabled from arthritis.  (Doc. 10 at 25).

Plaintiff improperly exaggerates and/or misinterprets Dr. Hulon's testimony.  The ME testified that Plaintiff has a "mild to moderate" lumbar impairment from his arthritis,

and referred to Plaintiff's knee and hip arthritis as "mild" based upon Plaintiff's full range of motion and normal strength and sensation, regardless of Plaintiff's reported pain. (Tr. 44). Dr. Hulon further testified that his use of "mild" in describing Plaintiff's arthritis was intended as a medical description, and not as a legal description that related to Plaintiff's functional limitations, which he conceded *could* be impacted by pain. (Tr. 43-44, 47-48). The ALJ did not inappropriately use Dr. Hulon's testimony, including his acknowledgement that the ability to work could be affected by pain (Tr. 46), but instead explained the basis for concluding that the objective medical evidence and clinical findings did not support the severity of the pain-related arthritic limitations to which Plaintiff testified. It was not error for the ALJ to partially rely on Dr. Hulon's testimony (as well as the ALJ's own credibility determination) for that conclusion.

Plaintiff contends that the ALJ should have given greater weight to Dr. Keown's much more limiting opinions concerning Plaintiff's abilities to stand and/or walk, all of which he claims were more consistent with his history of leg fractures and age-related arthritis. Although Dr. Keown was an examining consultant, the ALJ discounted her opinions together with the opinions of two consulting psychologists partially based upon the fact that her one-time July 2006 examination was relatively remote to the 1994-2010 alleged disability period. (Tr. 19). In addition, the ALJ noted that the objective medical evidence "primarily the examination and treatment notes from after the filing of the Title XVI claim" did not support Dr. Keown's earlier assessment. Consistent with that conclusion, the record includes multiple normal musculoskeletal and neurological examination findings, with a lack of swelling and normal muscle mass. As previously discussed, the ALJ was entitled to reject Dr. Keown's consulting opinions in favor of the alternative consulting opinions of medical expert Dr. Hulon (who had access to far more

19

records),[4] and state agency physicians Drs. Drew and Congbalay, all of whom opined that Plaintiff could perform a range of medium work.  (Tr. 618-27).

### 3. The ALJ's Credibility Determination

Had Plaintiff's testimony been accepted in full, he would have been found to be disabled.  However, the ALJ discounted Plaintiff's testimony as including "both mental and physical limitations significantly more severe than evidenced by the activities of daily living."  (Tr. 18).  In addition, the ALJ cited to Plaintiff's non-compliance with treatment as evidence that his pain was not as severe as alleged, and to his long history of substance abuse, on which his testimony was also "less than credible."  (Tr. 18).

A disability claim can be supported by subjective complaints, as long as there is objective medical evidence of the underlying medical condition in the record.  *Jones v. Com'r of Soc. Sec.*, 336 F.3d at 475.  However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability."  *Id.* at 476. (citations omitted).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Further, a credibility determination cannot be disturbed "absent a compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, his testimony, and other evidence.  *Warner v. Com'r of Soc. Sec.*, 375 F.3d 387,  392 (6th Cir. 2004).

---

[4]Dr. Keown specifically noted that she did not have primary care physician records.  (Tr. 310).

Plaintiff argues that, even though he was "not always compliant with medical treatment recommendations," the ALJ should not have relied upon that non-compliance for discounting his credibility. Plaintiff alleges that by 2009 and 2010, he was making regular visits to his physicians and taking prescribed medications. Moreover, Plaintiff argues that he was doing "everything possible" to control his diabetes, and that it was simply not his fault that his blood sugars remained uncontrolled. As support for this hypothesis, Plaintiff points to evidence that during a 2008 hospitalization, his blood sugars remained unstable despite (presumably) close medical attention from attending medical personnel during that hospitalization. (Tr. 551-555). Plaintiff reasons that if medical personnel couldn't control his blood sugars during that period, then "it stands to reason that the poor control of Plaintiff's diabetes would continue to exist" even if he had been fully compliant with treatment. (Doc. 10 at 29).

Plaintiff's argument too quickly brushes away his admitted non-compliance through 2008, and ignores the fact that Plaintiff was admitted to the hospital with diabetic ketoacidosis in July 2009 based upon his failure to follow a proper diet. (Tr. 518). Plaintiff admitted that he "sneaks into his cupboard gets all kinds of regular cokes, candy and fast food." (*Id.*). The doctor advised Plaintiff to stop abusing narcotics, beer and medications, and to follow a diabetic diet, but Plaintiff plainly ignored that advice. (Tr. 519, 681, 733, 740, 742-743). Plaintiff's argument that whether or not he complied with medical advice would have had no bearing on his blood sugar control is overly speculative and not grounds for reversal. In addition, the ALJ explicitly referenced Dr. Hulon's testimony concerning Plaintiff's non-compliance of additional medical advice. "At the hearing, Dr. Hulon explained that the claimant could be treated and cured for hepatitis C, but will not be so long as he keeps drinking." (Tr. 21).

Several of Plaintiff's credibility issues relate to his long history of substance abuse, summarized initially by the ALJ as follows:

> At a consultative examination with Robert Kennon, Ph.D., it was noted that the claimant smelled of alcohol, but did not appear intoxicated….During the exam, when asked how often he drinks, he stated "as often as I can."… At an October 2, 2008 consultative examination…, the claimant admitted to drinking about 4 times a week, but did not consider it a problem….However, he has admitted one charge of driving under the influence….Along with alcohol, he has acknowledged using LSD, cocaine, and marijuana, and has tested positive for benzodiazepines and opiates on multiple occasions….

(Tr. 15). At one point Plaintiff admitted to drinking up to twelve beers a day. (Tr. 387). The ALJ pointed out that Plaintiff's testimony on this issue was rife with contradictions, which undermined his credibility as a whole:

> He has a long history of substance abuse, which includes persistent use of illicit drugs, such as marijuana, cocaine, and benzodiazepines, along with the continued use of tobacco and alcohol, all of which has probably contributed to his symptoms. The claimant testified that he drinks a beer or two approximately three days a week and has not smoked cigarettes for 5 to 6 months. However, as recently as [just before the hearing], he reported drinking a 6-pack of beer every other day and smoking a half pack to a full pack of cigarettes a day.

(Tr. 18).

Plaintiff argues that the ALJ made a factual error by pointing to a record dated not just before the July 2010 hearing, but instead dated April 2010. (Tr. 733). But any erroneous reference to the month does not detract from the ALJ's critical point – that Plaintiff continued to report drinking and smoking marijuana in 2010 long after his doctors advised him to quit. For the first time before this Court, Plaintiff also questions the accuracy of the record on grounds that it is a "computerized medical record" which reflects identical answers to those contained in a January 2010 record. (Tr. 733, 740). However, the records state that the social history was "reviewed, no changes." (*Id.*).

And as Defendant points out, an additional notation is included in the April 2010 record regarding the amount of alcohol consumption ("4-6 beer/day") that does not appear in the January record. (*Compare* Tr. 733 with 740).

Plaintiff further argues that the ALJ should not have used his history of substance abuse as a basis for discrediting him because the record reflects a "downward trend" in such abuse, at least while Plaintiff was treating with Dr. Jette. (Tr. 698). Specifically, Plaintiff points out that on June 10, 2010, he reported he had not smoked in four months, (Tr. 696), consistent with his hearing testimony. And in May 2010, he reported to Dr. Jette that he drank three beers "occasionally" and smoked "rare" cannabis, suggesting the aforementioned "downward trend." (Doc. 10 at 29-30, citing Tr. 698). However, the debatable "downward trend" does not render the ALJ's analysis invalid, as the discrepancies in the record in Plaintiff's varying accounts provide substantial evidence for the adverse credibility determination.

As another basis for discounting Plaintiff's testimony regarding his pain level and alleged limitations, the ALJ cited Plaintiff's reported activities of daily living. Plaintiff asserts that the ALJ was not specific enough in providing examples of inconsistencies between his reported activity level and his testimony. However, that is not entirely accurate. The ALJ pointed to Plaintiff's testimony that he was able to walk only a block, stand for thirty minutes, sit for just one hour, and sleep for six hours. (Tr. 18). The ALJ contrasted those reported limitations with evidence that Plaintiff spent his days "watching television, reading, and visiting with friends," and admittedly can "cook, clean, drive, and take care of his personal needs." (Tr. 16 and 18, citing Tr. 241-243). Plaintiff's social skills also appeared to be less impaired than reported, given that Plaintiff stated that he visits with "his mother on a regular basis since she lives close by"

23

talks daily by phone with friends, currently lives with a friend and previously lived with his brother, obtains "diabetic testing supplies from widows of his friends who have passed," and goes "regularly…to taverns or cookout[s] with his friends." (Tr. 16). An ALJ is not only permitted to consider a claimant's level of daily activities in assessing his credibility, but is generally required to do so. *See* 20 C.F.R. §404.1529(c)(3); *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 392.

The ALJ noted that Plaintiff testified that his pain ranges from a "7" to a "9" on a 10 point scale, but during a visit to a clinic in April 2010, he reported his pain as "0." (Tr. 732).[5] Plaintiff calls it "disingenuous" for the ALJ "to pick the one page in this lengthy record in which Plaintiff stated that he was not experiencing pain….when the remainder of the record is full of Plaintiff's complaints of pain and observations by others of him being in at least mild distress." (Doc. 10 at 28). But the fact that Plaintiff likely suffers from some level of pain does not mean that his pain level is disabling. The ALJ's citation to the 2010 record, when considered in context of the record as a whole, was not error.

The ALJ pointed to various records indicating noncompliance with prescribed treatment. (Tr. 18). The ALJ was permitted to discount Plaintiff's self-reported limitations due to his noncompliance with treatment. *Accord Webster v. Sec'y of HHS*, 1985 WL 13523 (6th Cir. July 8, 1985); 20 C.F.R. §404.1530 (explaining that a claimant "must follow treatment prescribed by your physician if this treatment can restore your ability to work," and that an inability to follow such prescribed treatment without a good reason will result in a non-disability finding). And, although Plaintiff testified that he

---

[5]Plaintiff correctly notes that although the ALJ mistakenly cited the date as July 19, 2010, the record reflects a clinic visit on April 6, 2010.

uses "a cane, brace/splint, and glasses to assist him," the ALJ noted that none were prescribed by a doctor," (Tr. 18), a finding not refuted by Plaintiff.

The fact that some of Plaintiff's testimony was consistent with some medical evidence does not mean that the ALJ erred in drawing an adverse credibility inference. *See generally, Kyle v. Com'r of Soc. Sec.,* 609 F.3d 847, 857 (6th Cir. 2010)("[E]ven if this Court had come to a different factual conclusion, it would not disturb the findings of the ALJ which are based on substantial evidence.").  The ALJ did not simply dismiss Plaintiff's complaints in cursory fashion, but detailed specific discrepancies that led to his conclusion that Plaintiff's complaints of extreme limitations were not credible.

### III. Conclusion and Recommendation

For the reasons discussed herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED**, as it is supported by substantial evidence, and that this case be **CLOSED.**

> _/s Stephanie K. Bowman_
> Stephanie K. Bowman
> United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MICHAEL SHEARMAN,                                    Case No. 1:12-cv-760

      Plaintiff,                                            Spiegel, J.
                                                     Bowman, M.J.

   v.


COMMISSIONER OF SOCIAL SECURITY,

      Defendant.


## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).